UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: _____

BURGER KING CORPORATION,

    Plaintiff,

vs.

DARRYL D. BERRY and CAPITAL RESTAURANT GROUP, LLC, a Georgia limited liability company

    Defendants.
_____/

## BURGER KING CORPORATION'S
## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff Burger King Corporation ("BKC") sues Defendants Capital Restaurant Group, LLC ("Company") and Darryl D. Berry ("Guarantor") (Company and Guarantor are hereinafter collectively "Defendants") and states:

1. This is an action to enjoin Defendants' unauthorized use and display of BKC's valuable trademarks and service marks in connection with the unlawful operation of two restaurants as authorized BURGER KING® Restaurants. Additionally, this is an action for breach of the Franchise Agreements for Defendants' failure to operate two BURGER KING® Restaurants in accordance with the standards and specifications required by BKC.

## THE PARTIES

2. Plaintiff BKC is a Florida corporation with its principal place of business in Miami, Florida.

3. Defendant Company is a Georgia limited liability company with its principal place of business in South Carolina.

4. Defendant Berry is a citizen and resident of the State of Georgia.

## JURISDICTION AND VENUE

5. BKC operates and franchises restaurants throughout the United States. BKC's franchise operations are conducted and supervised from its world headquarters located in Miami, Florida. The parties have carried on a continuous course of direct communications by mail and by telephone through BKC's World Headquarters in Miami, Florida.

6. The course of dealing between BKC and its franchisees, including Defendants, shows that decision-making authority is vested in BKC's World Headquarters in Miami, Florida.

7. Defendants negotiated with BKC in Miami, Florida for the acquisition of long-term franchise agreements with the knowledge that they would benefit from their affiliation with BKC.

8. Defendants voluntarily entered into franchise relationships with BKC which envisioned continuing and wide-reaching contacts with BKC in Florida, including regulation of their franchised businesses from BKC's World Headquarters in Miami, Florida.

9. Defendants have purposefully availed themselves of the benefits and protection of Florida law by entering into franchise agreements with BKC which expressly provide that Florida law will govern any disputes among the parties.

10. Defendants have breached contracts which were to be performed in Florida by failing to operate and maintain the BURGER KING® Restaurants in accordance with the standards and specifications established by BKC.

11. This Court has jurisdiction over this action based upon:

(a) Section 39 of the Lanham Act, 15 U.S.C. 1121, and 28 U.S.C. 1331, 1337, and 1338 (a), for the claims arising out of Defendants' violations of Sections 32

and 43(a) of the Lanham Act, 15 U.S.C. 1114 and 1125(a);

(b)   28 U.S.C. 1338(b), and the doctrine of supplemental jurisdiction as codified in 28 U.S.C. 1367, for the claims arising out of Defendants' common law unfair competition and Defendants' breach of contract; and

(c)   28 U.S.C. § 1332 as the parties are citizens of different states and the amount in controversy exceeds $75,000.00.

12.   Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391 as a substantial part of the events and omissions giving rise to BKC's claims occurred within this judicial district.  Additionally, the parties have agreed that this Court shall have exclusive jurisdiction regarding the claims asserted in this suit.

13.   Defendants have agreed in writing that in any litigation to enforce the terms of the franchise agreements between BKC and Defendants, BKC, as the prevailing party, shall be paid by Defendants all costs, including attorneys' fees, incurred as a result.

14.   BKC has engaged undersigned counsel and has agreed to pay counsel reasonable attorneys' fees for all services rendered in this action and otherwise in connection with enforcing the agreements between BKC and Defendants.

15.   All conditions precedent to the institution of this action have been satisfied, discharged, excused, and/or waived.

## THE BKC MARKS

16.   To identify the source, origin, and sponsorship of BKC's facilities, products, and services, BKC has extensively employed, caused to be advertised, and publicized throughout the United States certain distinctive symbols as trademarks and service marks (the "BKC Marks"). BKC was the first to adopt and use the BKC Marks as trademarks and service marks, and all

right, title, and interest to the BKC Marks and the design, decor, and image of BURGER KING® Restaurants remain vested solely in BKC and its wholly-owned subsidiary, Burger King Brands, Inc. ("Burger King Brands").

17. BKC operates and franchises BURGER KING® Restaurants using the BKC Marks on signs, menu boards, posters, translights, uniforms, plates, cups, tray liners, and other items, and in advertising to the public through television, radio, and print media.

18. Set forth below is an abbreviated listing of the BKC Marks registered in the United States Patent and Trademark Office:

| Reg. No. | Mark | Issue Date |
|---|---|---|
| 782,990 | HOME OF THE WHOPPER | 1965 (renewed through 2015) |
| 869,775 | BURGER KING | 1969 (renewed through 2019) |
| 899,775 | WHOPPER | 1970 (renewed through 2020) |
| 901,311 | BURGER KING logo | 1970 (renewed through 2020) |
| 1,057,250 | BURGER KING logo | 1977 (renewed through 2017) |
| 1,062,368 | WHOPPER JR. | 1977 (renewed through 2017) |
| 1,076,177 | BURGER KING | 1977 (renewed through 2017) |
| 1,081,348 | HAVE IT YOUR WAY | 1978 (renewed through 2018) |
| 1,550,398 | CROISSAN'WICH | 1989 (renewed through 2019) |
| 2,428,846 | BURGER KING crescent logo | 2001(renewed through 2021) |

19. The registrations of the BKC Marks are currently in full force and effect, and BKC has given notice to the public of the registration of the BKC Marks as provided in 15 U.S.C. §1111. Burger King Brands owns, by assignment from BKC, each of the registrations for the BKC Marks listed above. Burger King Brands has granted to BKC the exclusive right to use the BKC Marks.

20. Pursuant to franchise agreements between BKC and its franchisees, BKC grants its franchisees a limited license and authority to use and display the BKC Marks, but only in such manner, and at such locations and times, as are expressly authorized by BKC. In no event is a franchisee authorized to use the BKC Marks after the expiration or termination of its franchise. Such unauthorized use is expressly prohibited under the terms of all BKC franchise agreements,

including Defendants' BURGER KING® Restaurant Franchise Agreements with BKC.

21. BKC's products bearing the BKC Marks are offered and sold in interstate commerce.

22. BKC and its franchisees have spent many millions of dollars in the United States and abroad advertising and promoting BKC's restaurants, services, and products.

23. The substantial investment made in the BKC Marks has resulted in valuable good will for the BKC Marks and for the restaurants, products, and services bearing those marks. BKC products and services have met with popular approval and, as a result of BKC's extensive sales, advertising, promotion, and publicity, the public is familiar with the BKC Marks. The products and services associated with the BKC Marks are understood by the public to be produced, marketed, sponsored, supplied by, and/or affiliated with BKC.

## THE BURGER KING SYSTEM

24. BKC has developed a comprehensive restaurant operating system for all BKC franchisees in order to protect the image of BURGER KING® Restaurants and to ensure uniform, high quality standards. The detailed specifications and procedures of the "Burger King System" are set forth in BKC's Manual of Operating Data (the "OPS Manual").

25. Every BKC franchisee is required by its franchise agreement to operate its franchise in accordance with the specifications and procedures contained in the OPS Manual. The OPS Manual sets forth in detail the mandatory BKC restaurant operating standards, specifications, and procedures, including rules governing areas such as food preparation and handling, cleanliness, health, sanitation, quality, and speed of service. In addition to these strict quality, service, and cleanliness requirements, the OPS Manual prescribes specified training procedures to ensure that these requirements are met. The OPS Manual is a confidential BKC

document which a franchisee is permitted to have only during the term of the franchise agreement.

26. BKC offers a broad range of services to its franchisees in order to monitor and assist a franchisee's compliance with these standards, including training for various levels of personnel at "Burger King University" in Miami, Florida as well as other regional and local training and instructional programs. This enables BKC to safeguard the integrity of BURGER KING® Restaurants, the BURGER KING® System, and the BKC Marks.

27. Integral to BKC's compliance and assistance program are periodic inspections and consultations undertaken by BKC personnel specially trained to observe and advise in all areas of restaurant operating procedure. Pursuant to BKC's Restaurant Visitation Process, action plans are issued after a restaurant inspection is conducted. These action plans serve as a training opportunity for the franchisee and as a quality assurance process for BKC to ensure that critical quality, service, and cleanliness standards are being met by the franchisee. Each BURGER KING® Restaurant Franchise Agreement confers upon BKC the right to enter the restaurant premises to perform this vital function.

28. As a result of its substantial expenditures of money and effort in developing and implementing the BURGER KING® System, BKC has established a high reputation and a positive image with the public as to the quality of products and services available at BURGER KING® Restaurants, which reputation and image have been, and continue to be, valuable assets of BKC. BKC strives to maintain that reputation through its careful selection of authorized franchise owners, facilities, and locations and its careful supervision over the manner and quality of its restaurant service.

## BKC'S AGREEMENTS WITH DEFENDANTS

29. Company owned and operated two restaurants, which are the subject of this action, as franchised BURGER KING® Restaurants (collectively the "Restaurants" and separately "BK#1214" and "BK#3262") in accordance with the terms and conditions of two separate BURGER KING® Restaurant Franchise Agreements (collectively the "Franchise Agreements", and separately the "BK#3262 Franchise Agreement" and the "BK#1214 Franchise Agreement").

30. The BURGER KING® Restaurant numbers, locations, and dates of the Franchise Agreements, are set forth below:

| *Restaurant No.* | *Restaurant Location* | *Date of Franchise Agreement* |
|---|---|---|
| BK #3262 | 6889 Dorchester Road<br>North Charleston, SC 29418 | June 30, 2010 |
| BK #1214 | 7 Cherry Street<br>Charleston, SC 29401 | June 30, 2010 |

## GUARANTEES

31. Pursuant to written guarantees (collectively the "Guarantees", and separately the "BK#3262 Guarantee" and the "BK#1214 Guarantee"), the Guarantor absolutely and unconditionally personally guaranteed the payment and performance of each and every obligation of Company to BKC under the Franchise Agreements.

## FRANCHISEE OBLIGATIONS

32. The Franchise Agreements contain provisions obligating Company to operate the Restaurants in accordance with the operating standards and specifications established by BKC, and requiring Company to maintain the equipment in a condition that meets the operational standards specified in the OPS Manual.  The Franchise Agreements further require Company to

7

replace equipment that becomes obsolete or inoperable.

33. The Franchise Agreements also prohibit Company from ceasing operation of the Restaurants during the terms of the Franchise Agreements and from ceasing to occupy the Restaurants' premises during the terms without BKC's written consent.

## DEFAULT AND TERMINATION

### Default

34. The Franchise Agreements contain provisions regarding default and establishing the parties' rights and obligations in the event of a default by the franchisee under the Franchise Agreements. The relevant terms of the Franchise Agreements provide that a franchisee's failure to comply with any provision of the Franchise Agreement is a default of the Franchise Agreement. The Franchise Agreements further provide that "[i]f an act of default hereunder is committed by FRANCHISEE, and FRANCHISEE fails to cure the default after any required notice and within the cure period applicable, BKC may, at its option and without prejudice to any other rights or remedies provided for hereunder or by law, terminate the Franchise Agreement by written notice or otherwise."

35. Company defaulted under the BK#3262 Franchise Agreement as a result of its failure to maintain the restaurant equipment in a condition that meets operational standards, as well as its failure to replace obsolete or inoperable equipment. Company defaulted under the BK#1214 Franchise Agreement by abandoning and ceasing operations at BK#1214.

36. By letters dated November 21, 2017, BKC notified Defendants of the defaults and demanded that they cure the defaults within 30 days from receipt of the letters or 33 days from the date of the letters, whichever was earlier ("Notices of Default").

37. Defendants failed to cure the defaults as set forth in the Notices of Default.

38. As a result of Defendants' failure to timely cure the defaults, the Franchise Agreements terminated effective February 2, 2018.

39. By letters dated February 2, 2018, BKC notified Defendants of the termination of the Franchise Agreements and demanded compliance with the post-termination covenants contained therein (the "Confirmation of Termination and Demand for Compliance").

### Termination

40. Terminated franchisees are prohibited from identifying themselves as either a current or former BURGER KING® Franchisee, from displaying or using any of BKC's trade secrets, promotional materials, the BKC Marks, or any mark confusingly similar. Terminated franchisees are further required, upon termination or expiration of their BURGER KING® Restaurant Franchise Agreement, to immediately make such removals or changes in signs and the building as BKC shall request so as to effectively distinguish the building and premises from its former appearance and from any other BURGER KING® Restaurant.

41. In violation of the Franchise Agreements, Defendants continue to hold themselves out to the public as owning and/or operating genuine and authorized BURGER KING® Restaurants by continuing to display and/or use the BKC Marks at the Restaurants subsequent to the Franchise Agreements' termination. Specifically, Defendants continue to operate BK #3262, despite termination. And although Defendants abandoned BK 31214, and are not operating at that location, Defendants have failed to de-identify the location. In so doing, Defendants are infringing upon the BKC Marks and breaching their explicit obligations under the Franchise Agreements.

42. Additionally, Defendants have not returned the OPS Manual and other operational manuals to BKC as required by the Franchise Agreements.

## **LIKELIHOOD OF CONSUMER CONFUSION AND DECEPTION**

43. Defendants have not tendered to BKC or removed all BURGER KING® signs, logos, menu boards, posters, translights, uniforms, plates, cups, tray liners, and other items bearing the BKC Marks, name, symbols, or slogans, or which are otherwise identified with BURGER KING® Restaurants and are located at the Restaurants.

44. Defendants' continued use of the BKC Marks or any items associated with the BURGER KING® name, symbols, or slogans at BK#3262 is without BKC's license or consent, and has caused or is likely to cause mistake, confusion, or deception in the minds of the public as to source, affiliation, and sponsorship.  Upon seeing the familiar BKC Marks, through Defendants' unauthorized use or display thereof, consumers will be deceived into concluding that the products and services sold at BK#3262 are made or supplied by BKC, are prepared in the prescribed BKC manner and subject to BKC's supervision, are sponsored or endorsed by BKC, and bear the BKC Marks pursuant to BKC's authority and permission.  Such impressions are calculated to and will have a material influence on customers' purchasing decisions, inducing them to patronize the Restaurants in reliance on the goodwill, reputation, and appeal of BKC.

45. Additionally, Defendants' continued display of the BKC Marks or any items associated with the BURGER KING® name, symbols, or slogans at BK#1214 is without BKC's license or consent.  Upon seeing the familiar BKC Marks, through Defendants' unauthorized use or display thereof, consumers will be deceived into concluding that the closed BK#1214 is sponsored or endorsed by BKC, and bears the BKC Marks pursuant to BKC's authority and permission.  Such impressions will have a material influence on customers' purchasing decisions, as well as BKC's goodwill and reputation.

46. By reason of the foregoing, BKC has suffered damages, in an amount presently

unknown yet substantial. BKC is no longer is the source or sponsor of the Restaurants and does not endorse said Restaurants, or the products and services provided therein, has not authorized Defendants to use or display the BKC Marks to identify the terminated franchise facilities, products, or services, and has protested expressly against such use.

47. By virtue of termination of BK#3262, BKC is unable to control the nature and quality of the goods and services that Defendants provide at BK#3262.

48. BKC will suffer serious, immediate, and irreparable harm if Defendants' willful infringement of the BKC Marks at the Restaurants is not immediately enjoined. BKC's goodwill and reputation will suffer drastically by virtue of the public's identification of BKC with the management and operation of BK#3262, as well as the unauthorized closure of BK#1214. BKC exercises strict quality control over every phase in the marketing of BURGER KING® products and services, from specification of ingredients, to the supervision of food preparation and handling, to the maintenance of strict standards as to cleanliness, health, sanitation, and quality of service. The carefully nurtured image which BKC now enjoys will be irretrievably injured by any association with the Restaurants, which no longer are subject to BKC's control and supervision.

49. Defendants' sale of products and services under the BKC Marks at BK#3262, as well as the display of the BKC Marks at the closed #1214 poses an immediate threat to the distinct, exclusive image BKC has created at great expense for its franchisees. BURGER KING® Restaurants, services, and products are known by the BKC Marks which are emblematic of their distinctive source. BURGER KING® Restaurants enjoy a special appeal to consumers which will be diluted by the existence of infringing restaurants with products and services bearing the distinctive BKC Marks. The intangible, but commercially indispensable, value that

the BURGER KING® Restaurants now enjoy will be severely undermined by the operation of BK#3262, and the use and display of the BKC Marks a BK#1214, which are making unauthorized use of the BKC Marks.

50. Consumer confusion as to the source or sponsorship of restaurants bearing the BKC Marks will be attended not only by an inevitable loss of product distinctiveness, image, and goodwill, but will also cause a diversion of sales from BKC. The economic injury to BKC resulting from such diversion is incalculable and, as such, is an additional source of irreparable harm.

## COUNT I
## LANHAM ACT INFRINGEMENT

51. BKC re-alleges Paragraphs 1 through 50 above as if fully set forth herein.

52. Defendants' acts constitute infringements of BKC's registered trademarks and service marks in violation of Section 32 of the Lanham Act, 15 U.S.C. 1114.

## COUNT II
## LANHAM ACT FALSE DESIGNATIONS

53. BKC re-alleges Paragraphs 1 through 50 above as if fully set forth herein.

54. Defendants' acts constitute false designations of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. 1125(a).

## COUNT III
## COMMON LAW TRADEMARK INFRINGEMENT

55. BKC re-alleges Paragraphs 1 through 50 above as if fully set forth herein.

56. Defendants' acts constitute unlawful trademark and service mark infringements under the common law.

## COUNT IV
## COMMON LAW UNFAIR COMPETITION

57.     BKC re-alleges Paragraphs 1 through 50 above as if fully set forth herein.

58.     Defendants' acts constitute unfair competition under the common law.

## COUNT V
## BREACH OF BK# 3262 FRANCHISE AGREEMENT

59.     BKC re-alleges Paragraphs 1 through 50 above as if fully set forth herein.

60.     Company defaulted under the BK#3262 Franchise Agreement as a result of its failure to maintain the equipment in a condition that meets operational standards, as well as its failure to replace obsolete or inoperable equipment.  These breaches have directly and proximately caused loss and damage to BKC.

61.     Company's operation of BK#3262 after termination of the BK#3262 Franchise Agreement and failure to abide by the post termination covenants is also a breach of the BK #3262 Franchise Agreement.  These breaches have directly and proximately caused loss and damage to BKC.

## COUNT VI
## BREACH OF BK# 1214 FRANCHISE AGREEMENT

62.     BKC re-alleges Paragraphs 1 through 50 above as if fully set forth herein.

63.     Company defaulted under the BK#1214 Franchise Agreement by its cessation of operations at BK#1214, its abandonment of the Restaurant premises and its failure to abide by the post termination covenants.  These breaches have directly and proximately caused loss and damage to BKC.

## COUNT VII
## BREACH OF BK#3262 GUARANTEE

64.     BKC re-alleges Paragraphs 1 through 50, 60 and 61 above as if fully set forth

herein.

65. Company defaulted under the BK#3262 Franchise Agreement as a result of its failure to maintain the equipment in a condition that meets operational standards, as well as its failure to replace obsolete or inoperable equipment. Company's operation of BK#3262 after termination of the BK#3262 Franchise Agreement and failure to abide by the post termination covenants is also a breach of the BK #3262 Franchise Agreement.

66. Pursuant to the BK#3262 Guarantee, Guarantor unconditionally and irrevocably personally guaranteed to BKC the performance of each and every obligation of Company under the BK#3262 Franchise Agreement, should Company fail to perform such obligations.

67. The failure of Guarantor to ensure Company's compliance with the BK#3262 Franchise Agreement constitutes breaches of the BK#3262 Guarantee.

**68.** As a direct and proximate result of the breaches of the BK#3262 Guarantee, BKC has been damaged.

## COUNT VIII
## BREACH OF BK#1214 GUARANTEE

69. BKC re-alleges Paragraphs 1 through 50 and 63 above as if fully set forth herein.

70. Company defaulted under the BK#1214 Franchise Agreement by its cessation of operations at BK#1214, its abandonment of the Restaurant premises and its failure to abide by the post termination covenants.

71. Pursuant to the BK#1214 Guarantee, Guarantor unconditionally and irrevocably personally guaranteed to BKC the performance of each and every obligation of Company under the BK#1214 Franchise Agreement, should Company fail to perform such obligations.

72. The failure of Guarantor to ensure Company's compliance with the BK#1214 Franchise Agreement constitutes breaches under the BK#1214 Guarantee.

73. As a direct and proximate result of the breaches of the BK#1214 Guarantee, BKC has been damaged.

## DEMAND FOR ATTORNEYS' FEES

74. The Franchise Agreements and Guarantees at issue in this litigation provide that the prevailing party is entitled to its attorneys' fees and costs. Pursuant to those provisions, BKC hereby demands that it be reimbursed by Defendants for all costs and expenses (including attorneys' fees) relating to prosecution of this action.

## REQUEST FOR RELIEF

WHEREFORE, Burger King Corporation demands judgment against Defendants Darryl D. Berry and Capital Restaurant Group, LLC:

1. For preliminary and permanent injunctions enjoining Defendants, and all persons acting on their behalf, in concert with them, or under their control, from:

    (a) manufacturing, packaging, distributing, selling, advertising, displaying, or promoting any product or service bearing any of the BKC Marks, or any colorable imitation thereof at the Restaurants;

    (b) displaying or using any of the BKC Marks to advertise or promote the sale of, or to identify, the Restaurants, or any product or service provided therein; and

    (c) making in any manner whatsoever any statement or representation, or performing any act, likely to lead members of the public to believe that Defendants, the Restaurants, and the products and services provided therein, are in any manner, directly or indirectly, associated, affiliated, or connected with, or licensed, sponsored, authorized, or approved by Burger King Corporation.

2. For preliminary and permanent injunctions directing Defendants, and all persons

acting on their behalf, in concert with them, or under their control, to:

    (a)    recall and deliver up to Burger King Corporation all signs, banners, labeling, packaging, advertising, promotional, display, and point-of-purchase materials which bear, or make reference to, any of the BKC Marks, or any colorable imitation of the BKC Marks;

    (b)    recall and deliver up to Burger King Corporation all copies and editions of the OPS Manuals that are in their actual or constructive, direct or indirect, possession, custody or control, including all supplements and addenda thereto, and all other materials containing restaurant operating instructions, restaurant business practices, or plans of Burger King Corporation;

    (c)    allow Burger King Corporation, at a reasonable time, to enter the premises of the Restaurants and make whatever changes, including removal of tangible assets, that are necessary to distinguish the premises from their appearance as a BURGER KING® Restaurant;

    (d)    account and pay over to Burger King Corporation all gains, profits, and advantages derived by Defendants from the trademark and service mark infringement, breach of contract, and unfair competition to the full extent provided for by Section 35 of the Lanham Act, 15 U.S.C. §1117, and by the controlling principles of common law.

3.    For money damages, plus three times additional actual damages BKC has sustained by reason of Defendants' trademark and service mark infringement, breach of contract, and unfair competition, pursuant to Section 35 of the Lanham Act, 15 U.S.C. §1117;

4.    For punitive damages because of the willful nature of Defendants' actions;

5. For pre-judgment interest and Burger King Corporation's reasonable attorneys' fees incurred in protecting its rights in this action in accordance with the terms of the Franchise Agreements and, because of the willful nature of the infringement, pursuant to Section 35 of the Lanham Act, 15 U.S.C. §1117;

6. For an order enjoining Defendants from operating a quick service hamburger restaurant within a two-mile radius of BK #3262 and BK #1214 for a one-year period;

7. For an order directing Defendants to file with the Court, and to serve on Burger King Corporation's counsel within ten days after service of any injunction or order issued herein, or within such a reasonable time as the Court shall direct, a report, in writing and under oath, setting forth in detail the manner in which Defendants have complied with such injunction or order;

8. For all costs, disbursements, and expenses of this action; and

9. For all such other relief as this Court may deem just and proper.

10. Plaintiff Burger King Corporation demands judgment against Defendants Darryl D. Berry and Capital Restaurant Group, LLC, jointly and severally, for damages, including lost profits, attorneys' fees, interest and costs pursuant to the Franchise Agreements and Guarantees, and for such other relief as this Court deems just and proper.

Dated: February 2, 2018.
      Miami, Florida

Respectfully submitted,

**/s/** Michael D. Joblove_____
Michael D. Joblove, Esq.
Florida Bar No.: 354147
mjoblove@gjb-law.com
Jessica Serell Erenbaum, Esq.
Florida Bar No.: 816000
jerenbaum@gjb-law.com
GENOVESE JOBLOVE & BATTISTA, P.A.
4400 Bank of America Tower
100 Southeast Second Street
Miami, Florida  33131
Telephone:     (305) 349-2300
Facsimile:     (305) 349-2310
*Attorneys for Burger King Corporation*

2000-720 / #27